## 38779. MOORMAN v. WILLIAMS *et al.*

Felton, Chief Judge. 1. Assuming for the sake of argument that the driver of the truck was negligent in attempting to cross the public road under the circumstances, which fact we expressly do not decide, the uncontradicted evidence in the case shows that the deceased could, in the exercise of ordinary care, have seen the truck entering into and crossing the public road when the automobile driven by the deceased was approximately 150 yards away, and that he could, by the exercise of ordinary care, have avoided the consequences of the defendant's negligence, if any. *Code* § 105-603; *Central of Ga. Ry. Co. v. Roberts*, 213 Ga. 135 (97 S. E. 2d 149), and cit.

2. The plaintiff mother in this case is barred by the negligence of her son, damages for the tortious death of whom she seeks to recover. *Porter v. Southern Ry. Co.*, 73 Ga. App. 718 (37 S. E. 2d 831); *Lowe v. Payne*, 156 Ga. 312 (118 S. E. 924).

The court correctly awarded a nonsuit.

*Judgment affirmed. Nichols and Bell, JJ., concur.*

Decided May 4, 1961—Rehearing denied May 18, 1961.

*H. T. Hicks, Beverly B. Hayes*, for plaintiff in error.

*Sharpe & Sharpe, T. Malone Sharpe, T. Ross Sharpe, J. Emory Rowland*, contra.

Mrs. Willie Mae Moorman sued J. D. Williams & Son, a partnership composed of J. D. and Joe E. Williams, to recover the value of the life of her son, William Moorman, who was allegedly killed by the negligence of an employee of the defendant. On the subject of the alleged negligence of the defendant, the petition alleged as follows: "3. That Sim Cook, who was in the employ of the said J. D. Williams & Son on the 21st day of November, 1958, while operating a large truck, pulling a twenty (20) foot trailer, entered the highway leading from Wrightsville, Georgia, to Spann, Georgia, to make a left turn from the private driveway of Lanier Lumber Company, and failed to stop and see that the highway, which was a two-lane paved highway, was clear of traffic, which was flowing

in each direction on said highway at the time, and entered said highway and blocked the same completely while the automobile driven by her son, William Moorman, was approaching, and when it was too late for her said son, William Moorman, to be able to stop, thereby causing the death of her said son, William Moorman, on said date. 5. That said wreck took place on the 21st day of November, 1958, on the paved highway leading from Wrightsville, Ga., to Spann, Ga., a distance of about one and one-half (1½) miles from Wrightsville, Ga., at a point on said highway directly in front of the Lanier Lumber Company planing mill and lumber plant, at about 4:30 o'clock p.m. 6. That the said Sim Cook in entering said paved highway to make a left turn from the private driveway of Lanier Lumber Company, without stopping to see that the highway was clear of traffic flowing in each direction, and that it was safe for him to make said left turn and block said highway, thereby violated the traffic laws of the State of Georgia, and is thereby guilty of negligence per se, having caused said wreck and the death of her said son, William Moorman, by violating said traffic laws of the State of Georgia. 10. That at the time said William Moorman was killed in said wreck, he was not violating any laws of the State of Georgia, and was traveling the right-hand side of a two-lane paved highway, where he had a right to travel, and was not driving more than fifty to fifty-five miles per hour when said truck, driven by the said Sim Cook for J. D. Williams & Son, drove out in front of him and completely blocked said highway, when it was too late and impossible for her said son, William Moorman, to stop said car and avoid striking said truck, and that her said son, William Moorman, did all in his power to keep from striking said truck and to prevent said wreck, as he had pulled his said car as far to the right as he possibly could, but said highway was completely blocked by said Sim Cook, while operating said truck for J. D. Williams & Son, when the car in which her said son, William Moorman, was driving was approaching on said highway, coming from Wrightsville, Ga., and traveling in a southwesterly direction towards Spann, Ga., completely blocking both lanes of said highway, when the car which her said son

was driving was too close to said truck, and when it was impossible for him to have stopped before striking said truck, thus causing said wreck and causing the death of her said son, William Moorman, on said date. 11. That her said son, William Moorman, was 23 years of age and in good health on the date he was killed." After the introduction of the plaintiff's evidence, the court granted a nonsuit, to which judgment the plaintiff excepts.

L. T. Chester testified for the plaintiff substantially as follows: Direct Examination. I knew the deceased, William Moorman. He worked for me four or five years before his death, on the 21st of November, 1958. He was in my employment at that time. The deceased was involved in an accident on the 21st of November, 1958. I saw the accident, which occurred approximately 150 to 200 feet from the office of Lanier Lumber Company on the Wrightsville-Spann Road. I was in my office and John Henry Carter was going in to transact some business. I have an office beside a window. I happened to look out of the window, and drew John Henry Carter's attention and I said that there was going to be a wreck, or words to that effect. I saw the truck pull out and saw the car coming. You could hear the tires squeak, and that was my observation. I saw this particular truck pulling out and the incident struck my mind when I saw the car coming. I imagine it was 100 yards. The truck was driven by Sim Cook. I saw the car hit the trailer almost from the wheels to the back end. The extension there may be 4 or 5 feet. It hit the trailer, which was still moving, somewhere about from the wheels to the rear end of the trailer. The truck was blocking the paved highway from Wrightsville to Spann. I would say that the automobile was on its right-hand side when it hit the rear end of the trailer. William Moorman had pulled off to the right and half of his automobile was off of the paved portion of the road. It seemed to me that the truck driver, instead of trying to make a turn, tried to beat the automobile across the road. In driving from the mill into or across the road, there is no kind of substance that would block the view. You would not have to pull on the highway to be able to see to the left. There were weeds there,

but we kept it fairly clear where a man could see. You have to pull pretty close to the highway before you can see up towards Wrightsville. I could see further from where I was because my office was up on the hill. Numerous trucks are going in and out of that place every day. There are several roads on each side of the highway running off the highway, three or more on each side. There are a lot of skid marks all over that highway. I have seen people drive down that road and turn into my office. I have seen them do the hoop slide. There are always a lot of skid marks. That was a race road, if you want my observation. Across the road there is about a three and one-half foot grade on the right coming back towards Wrightsville from the office. There is no hill there of any noticeable size. The highway is comparatively straight there. There is a slight curve at the railroad crossing but I would say it is a good road. There are no traffic control devices up and down that highway, stop signs or anything. If it pleases the court, I would like to make this observation. I, myself, put obstacles in that road. I would scatter stuff in that road to make people slow down because we had so much equipment going back and forth a hundred times a day and we always feared that one of our tractor drivers would get run over. I saw the car approaching about 100 yards down the road. I have been driving a car about 25 years. It is hard to say how fast one is driving when he is driving straight toward you or away from you, but I can just estimate, just guess, but I would roughly say that the car was traveling between 55 and 60 miles an hour. Cross-examination. It was approximately 150 yards from my office to the truck and 150 yards from the truck to the car. The road is perfectly straight there. The surface of the road is good. There is good traction for tires. Nothing occurred from the time I saw the car 100 yards away from the truck to keep the car from stopping. There was nothing on the road except the truck which was pulling out. There is a sign at the railroad that says "stop." That is the only sign I know of between the church and the railroad going to town. It was 310 yards from the truck to the railroad crossing. Re-direct Examination. The driveway out of which Mr. Williams' truck was coming was a

private driveway. William Moorman was traveling on a public highway. I think that the truck driver was familiar with that part of the road and any hazards that would exist. He didn't drive a tractor very much but he had worked there I guess around 4 years. I think the shortest trailer Mr. Williams has is 20 to 22 feet. Re-cross-examination. There is one building, I'd say 100 feet off of the road coming towards town on the left. The next building is the church which I guess is two-thirds of the way to the railroad, then the office building; there is one small building practically on the right of way on the right; it is the Power Company building with meters and things in it. The saw mill has one large shelter and a small one which are about 40 or 50 feet from the right of way, on the right-hand side going out. On the left-hand side there is a planer shed. There is one office building down there. There were lots of weeds out there at the time. There are a lot of cars and there would be obstructions at times. There was a road leading from the right-hand side of the road across to the planing mill, a private entrance way. It was primarily a private road. The public could use it ordinarily. There was no sign showing it was a private driveway. Mr. Williams' trucks used the driveway and my trucks used it. Everybody that had business there used it when they wanted to. Re-direct Examination. It is a private driveway that is owned by Lanier Lumber Company.

L. C. Lewis testified for the plaintiff substantially as follows: Direct Examination. I knew William Moorman. As to what happened on November 21, 1958, I went to the parade, got off at dinner, and I asked William Moorman to bring me and my wife home. He said he was going out that way and would take me home, and coming on I don't know exactly how fast he was running. We were sitting there talking and I was looking out across the field. I wasn't driving the car. He was the one driving and I looked back around and we were into the trailer. He slowed down for the railroad crossing. We came on up there and when I looked back around we were into the trailer. I was looking out across the field and not looking up the road. I was sitting on the right-hand side in the front of the car. I would say we were traveling about 50 or 60 miles an

hour. After the collision the tractor was on the side of the road going down the hill towards the planer and the trailer was sitting sort of in the way. We hit the rear end of the trailer. When we hit, it was sitting sort of across the road. The truck and trailer came from out of the driveway. When we all realized the truck was blocking the highway, I heard the brakes squeak. All I know is that he hit the truck. It was done so fast I didn't have time to think about what happened. William Moorman had two wheels on the dirt, the right two wheels. My wife was also with me in the car at that time. She was sitting in the back. I do not know how fast the truck was traveling. When I first saw the truck we were next to the church and I looked back across the field. I wasn't paying any attention. Cross-examination. The truck was coming out in the highway when I saw it when we were opposite the church. I imagine the church is about 200 yards from where the automobile hit the trailer. I turned and I looked across the field to my right and the next thing I knew was that we were right on the truck and we hit the tail end of it.

Annie Williams testified for the plaintiff substantially as follows: Direct Examination. I was riding with William Moorman on the 21st of November, 1958. He said he would carry us home and I got in his car to ride with him. Nothing happened until the wreck. When I saw it we were up on the truck. The truck was across the highway. I was sitting in the back seat. I do not know how far the automobile was from the truck and trailer when I first saw the truck and trailer. I do not know how to estimate the distance. It might have been as far as from here to the back of the courtroom, or it might have been further. I was looking down at my pocketbook at the time counting my money. When it happened it frightened me and I just said "Lord have mercy" and closed my eyes. The rear end of the truck was across the road and the trailer was on the other side of the road. It seemed to me that William Moorman tried to hit the other side of the road to keep from hitting the trailer. I remember that we crossed the railroad before the accident. William Moorman probably slowed down at the railroad. I do not know how fast we were traveling at the time

of the accident. After the accident, the automobile was pretty tore up at the top. Cross-examination. All I know is that they had a wreck out there. The church is on the left hand side. I reckon it is about 200 yards or 150 yards this side of where the wreck happened. The wreck happened in front of Mr. Chester's office. Re-direct Examination. When I first saw the truck and trailer they were crossing the highway.

John Henry Carter testified for the plaintiff substantially as follows: Direct Examination. I knew William Moorman on the 21st day of November, 1958. I witnessed the accident. Mr. Chester and I were in the office. We heard the brakes squealing and Mr. Chester said, "Look yonder, they are having a wreck." I looked out of the window and by that time they had collided. I saw the actual impact. The automobile was coming up the road and the truck was in the road. The truck was pulling out and I guess he was coming back towards town. The truck had pulled out from next to the office, from the driveway of Lanier Lumber Company. I would not say that the highway was completely blocked by the truck. Pretty much of the paved portion of the highway was completely blocked by the truck and trailer. The car was knocked over in the ditch. I would not say that the truck was stopped at the time of the impact. After the impact the truck went on down next to the planer. As to what I can tell you that William Moorman did to prevent the collision is that he was on his side of the road. He was in the ditch to the right when I got there. I had occasion after the wreck to go out there and see where this car had skidded. I stepped off the skid marks and I would say they were about 60 yards long, or 180 feet. That is where Moorman had his brakes on. The car did not go beyond the trailer after it hit the trailer. The car was knocked over into the ditch. The road is perfectly straight at that place. The church is about 200 yards north of that place. The pavement was in good condition. I think I could have stopped my automobile on this pavement driving at a reasonable rate of speed. I think a man driving at a reasonable rate of speed on this pavement could stop without any trouble. As a result of the wreck the top of the automobile was cut off on the driver's side. It was a Ford

automobile, but I don't know what model. As to whether the car had to be traveling at a high rate of speed to strike an object at right angles and do that much damage to the car, well, I think 'he was running pretty speedy. I wouldn't argue about the speed. Re-direct Examination. I wouldn't think that there would have been an accident if the truck had not pulled out on the highway in front of the automobile. If William Moorman had had the car under control, there could have been an accident.